**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

CHRISTINA L. OURS,

        **Plaintiff,**

v.                                    **Civil Action No. 1:07CV112
                                    (Judge Keeley)**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB")

under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433,

1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been

referred to the undersigned United States Magistrate Judge for submission of proposed findings of

fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P.

83.12.

## I. Procedural History

Christina L. Ours ("Plaintiff") filed an application for SSI and DIB on July 12, 2005,

alleging disability since October 1, 2004, due to low back pain, a bulging disc, and nerve damage

(R. 88, 94). Plaintiff's applications were denied at the initial and reconsideration levels (R. 71-72,

79, 82). Plaintiff requested a hearing, which Administrative Law Judge George A. Mills, III ("ALJ")

held on December 6, 2006, and at which Plaintiff, represented by Anthony Rogers, Esquire, and

James Ganoe, Vocational Expert ("VE"), testified (R. 33-70). On February 8, 2007, the ALJ entered

a decision finding Plaintiff was not disabled (R. 19-28). Plaintiff filed a timely appeal of this decision with the Appeals Council. On June 10, 2007, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 5-9).

## II. Statement of Facts

Plaintiff was born on August 18, 1977, and was twenty-nine (29) years old on the date administrative hearing (R. 39-40). Plaintiff is a high school graduate (R. 41). Plaintiff began working in May, 2003, at a nursing home as a general worker, performing housekeeping duties and kitchen chores. Plaintiff was employed until June, 2004 (R. 43, 115).

Medical Evidence

On June 30, 2003, Plaintiff presented to Amy Kump, a physician's assistant at E. A. Hawse Health Center, and reported a history of asthma and complained of "cold symptoms." Plaintiff was five feet, five inches tall and weighed 167 pounds. Plaintiff was diagnosed with asthma with bronchospasm and treated with Albuterol nebulizer. She was prescribed Albuterol, Clarinex, Asthmacort and Foradil (R. 177).

On July 7, 2003, Plaintiff presented to P.A. Kump, complaining of no change in her June 30 asthma and allergy conditions. Plaintiff was instructed to medicate with Clarinex daily and discontinue Asthmacort. P.A. Kump prescribed a nebulizer machine and Albuterol for treatment of Plaintiff's allergy related asthma (R. 176).

On July 15, 2003, Plaintiff reported to P.A. Kump that she experienced an improvement to her asthma-related symptoms. Plaintiff was prescribed Advair (R. 175).

On August 12, 2003, Plaintiff complained of a "knot in her chest for about a week" to P.A. Kump. Plaintiff reported that Dr. Gehman had diagnosed calcium build up on the "upper medial

aspect of the right breast" through a chest x-ray. Plaintiff stated the area had been aggravated when she lifted a mop bucket at work. Plaintiff's weight was 171 pounds; her blood pressure was 120/80. P.A. Kump diagnosed "possible myalgia or muscle strain, or possible calcium deposit as previously diagnosed" after her examination revealed a "firm, non-movable mass located just superior to the medial upper aspect of the breast." No discernable palpable mass was present in the mid-epigastric area, but that area was tender to palpation. P.A. Kump ordered a chest x-ray, excused Plaintiff from work for that date, and instructed her to take 800mg ibuprofen three times daily (R. 174).

On August 12, 2003, Plaintiff had an x-ray made of her chest. It showed "no acute parenchymal process" (R. 199).

On May 4, 2004, Plaintiff presented to E.A. Hawse Health Center and complained of low back pain that extended to her left leg. Plaintiff described the pain as sharp and at a level of eight on a scale of one to ten. Plaintiff stated she experienced trouble sleeping and weakness in her leg. Plaintiff stated she "noticed several times . . . [her] left leg 'giving out,'" but she denied any numbness or tingling. Plaintiff stated she had fallen a week earlier at work and had landed on her back and buttocks. Upon examination, Plaintiff had point tenderness over sacrum/coxyx and left hip. Her leg extensions were symmetrical; her Romberg was negative; and her gait was with a slight limp. Plaintiff was diagnosed with low back pain with left leg radiculopathy. Plaintiff was excused from work for the next day and her lifting was restricted to no more than twenty-five pounds. Plaintiff was instructed to take 800mg of ibuprofen, with food, as needed, for treatment of her pain. She was prescribed Skelaxin and Darvocet (R. 168).

On May 5, 2004, an x-ray was made of Plaintiff's lumbar spine. It was normal (R. 198).

On May 12, 2004, a MRI test was completed of Plaintiff's lumbar spine. It showed that

3

alignment was normal and that disc space was well preserved. The signal in the lumbar vertebra was normal and there was no conus abnormality. Plaintiff canal was normal sized. The interspaces from T12 through L5-S1 were unremarkable, "with the exception of a mild central bulge of the L5-S1 disc," which was "sufficient to just gently indent the ventral aspect of the sac" and was "contiguous with the right S1 root but [did] not produce any mass effect or deformity . . . ." The "finding [was] of questionable significance" and the "exam [was] otherwise unremarkable" (R. 196-97).

Plaintiff received physical therapy for low back pain beginning in May, 2004. Physical Therapist Mark Hamilton noted plaintiff experienced tingling and numbness after sitting for fifteen minutes (R. 153). In a letter to Andy Funkhouser, P.A., P.T. Hamilton noted, on May 26, 2004, that Plaintiff had difficulty lifting ten pounds (R. 154).

On June 1, 2004, a physician's assistant from the E.A. Hawse Health Center provided Plaintiff with a return to work document, on which it was written that her lifting was limited to less than five pounds.

On June 25, 2004, Plaintiff returned to E. A. Hawse Health Center for follow up for her back pain. She stated her pain had improved with the use of ibuprofen and physical therapy. Plaintiff had no gait disturbances or sensory deficits. Plaintiff had tenderness over left lower spine and her paraspinal muscles were tight. Plaintiff's lower extremities were symmetrical appearing, her muscle strength was 5/5, Romberg was negative, and vibration sensation was intact. Plaintiff was diagnosed with low back pain and instructed to continue treatment with Ibuprofen (R. 159).

On June 25, 2004, Physical Therapist Hamilton informed P.A. Funkhouser that Plaintiff had not made progress at physical therapy as she had attended only four sessions. He suspected she had a "disc bulge" and would benefit from a neurological consultation (R. 152).

4

On July 6, 2004, Physical Therapist Hamilton informed P.A. Funkhouser that Plaintiff had begun to tolerate light and limited exercise (R. 151).

On July 9, 2004, Physical Therapist Hamilton wrote to P.A. Funkhouser that Plaintiff was working on lifting forty-five pounds, but that she still experienced pain with "twisting or lumbar compression" (R. 150).

On July 9, 2004, Nurse Practitioner Jean Waters noted that Plaintiff had experienced an increase in her low back pain but without radiculopathy. N.P. Waters noted Plaintiff was in minimal distress and she was neurologically intact. Plaintiff had full range of motion in her back, but she shifted her weight to the right while sitting. N.P. Waters "encouraged" Plaintiff to continue treating her low back pain with ibuprofen and physical therapy. She prescribed light duty work on a part-time basis to Plaintiff (R. 158).

On July 23, 2004, Physical Therapist Hamilton corresponded with Jean Waters, informing N.P. Waters that Plaintiff could not be helped further with physical therapy because she could not tolerate exercise due to a July 16, 2004, fall at home (R. 149).

On July 23, 2004, Plaintiff was examined by N.P. Waters. Plaintiff stated her low back pain had worsened since she started physical therapy. N.P. Waters noted Plaintiff was in no acute distress, but ambulated slowly and was "quite guarding [sic] with full range of motion." N.P. Waters found Plaintiff showed "[v]ery poor tolerance for torso rotation," had paraspinal muscle tenseness, and had point tenderness at L3 through L5. Plaintiff's muscle strength was equal and she was neurologically intact. N.P. Waters diagnosed low back pain and low tolerance of physical therapy. N.P. Waters instructed Plaintiff to continue with gentle stretching, warm compresses, and taking ibuprofen (R. 157).

On August 9, 2004, Plaintiff presented to Benjamin Rezba, M.D., with complaints of low back pain and her left leg "giv[ing] out." Dr. Rezba ordered an EMG and NCV of Plaintiff. He diagnosed lower back pain, bulging disc at L5-S1, and left leg radiculitis. He instructed Plaintiff to return in five weeks (R. 230).

Plaintiff had an x-ray made of her pelvis on September 8, 2004. The bony pelvis, sacroiliac joints, and hips were normal, and no bone or joint abnormalities were detected (R. 195).

On September 8, 2004, Plaintiff was examined for low back pain by Dr. Rezba. She informed Dr. Rezba that her back started hurting during her 2001 pregnancy, because "the baby was laying on the sciatic nerve for most of that time." Upon examination, her pain was "fairly marked" in her lower back right at the lumbosacral junction. There was no sciatic notch pain. She had limited forward flexion and her extension and lateral bending were mildly limited. Plaintiff's sitting leg raising test was negative and her reflex motor sensory exam was normal. Plaintiff was diagnosed with low back pain, left leg radiculitis, and bulging disk at L5-S1 (which was based on Plaintiff's May 12, 2004, MRI results). She was prescribed Darvocet (R. 156).

Dr. Rezba noted on September 27, 2004, that Plaintiff's "x-rays were normal" (R. 156).

On October 5, 2004, an EMG study of Plaintiff's left leg was normal. It showed no "evidence of left lumbar radiculopathy" (R. 192-93).

On October 11, 2004, Dr. Rezba noted Plaintiff's EMG/NCV studies of her left leg were normal. He found there was no evidence of left lumbar radiculopathy. He instructed Plaintiff to treat her lower back pain with ibuprofen. Dr. Rezba instructed Plaintiff to treat her torn gastrocnemius soleus muscle with ice after activities and heat before activities to "let it stretch out." Plaintiff was instructed to return to Dr. Rezba's care in three months (R. 228).

On February 8, 2005, Plaintiff informed Dr. Rezba that her back continued to "bother" her.

Dr. Rezba ordered a Doppler Study to determine if Plaintiff's left calf swelling and pain were symptoms of muscle irritation or deep vein thrombosis. Dr. Rezba diagnosed chronic lower back pain and painful, swollen left calf. He prescribed Darvocet, Oruvail, and Lasix, which was to reduce water retention prior to the start of her menstrual period. Plaintiff was instructed to return in one month (R. 227).

On February 8, 2005, Plaintiff underwent a vein study of her lower extremities for low back pain and left calf pain. The study was negative for deep vein thrombosis (R. 191).

On March 10, 2005, Plaintiff reported to Dr. Rezba that she experienced a "constant chronic dull ache, pain in the left calf" with "non-specific radiculitis." Dr. Rezba noted Plaintiff had "a mild bulge over the disc but negative NCV and EMG studies." He prescribed Darvocet, Medrol dosepak instead of Lasix, and Feldene. He diagnosed chronic low back pain and instructed Plaintiff to return for evaluation in three months (R. 226).

On June 7, 2005 Plaintiff presented to Dr. Rezba with complaints of chronic back and left leg pain. She stated she experienced swelling in her feet. She reported that a Medrol dosepak "did help quite a bit" and that Feldene "help[ed], too." Dr. Rezba prescribed Lasix, Feldene, and Darvocet. He diagnosed chronic low back pain and instructed Plaintiff to return to his care in three months (R. 225).

On July 23, 2005, Plaintiff completed a Function Report – Adult relative to her application for disability benefits. She listed her activities of daily living as follows: prepared and ate three meals per day; washed dishes; did laundry weekly; and "straight[ened] up living room." Plaintiff wrote she sat down to rest after each meal and after completing daily chores (R. 122). Plaintiff wrote she cared for, in addition to herself, both her husband and her son. Plaintiff wrote she was no

longer able to lift fifty pounds at work as she once was able to do. Plaintiff noted she had "no problem" in caring for her personal needs (R. 123). Plaintiff wrote she prepared three meals per day, it took two hours to prepare those meals, and the impact of her condition on this chore was she "slow[ed] down a lot." Plaintiff listed the following as completion times for household chores: two days to complete laundry; two hours to dust living room; and one day to clean bathroom. Plaintiff could not vacuum (R. 124). Plaintiff wrote she did not get outside "every [sic] much"; rode in a car; did not drive a car; shopped for groceries once a month, for four hours at a time. Plaintiff could pay bills, count change, handle a savings account, and use a checkbook and money orders (R. 125).

Plaintiff "work[ed] on plastic canvas" every day as a hobby. Plaintiff spent time with others, three times weekly, watching television and/or talking. Plaintiff did not go to places on a regular basis. Plaintiff, when she did go somewhere, did not require someone to accompany her (R. 126). Plaintiff wrote that her social activities had not changed since the onset of her symptoms. Plaintiff had no problems "getting along with family, friends, neighbors" (R. 127).

Plaintiff wrote that her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, and complete tasks. She could lift only five pounds; squatting caused pain; she could not "bend that far"; Plaintiff could stand for five minutes; she could not reach above her head due to pain; she could climb six steps at a time; she could walk five minutes before she needed to rest for twenty minutes. Plaintiff wrote she could pay attention "for long time," could finish what she started, and could follow spoken and written instructions (R. 127). Plaintiff got along well with authority figures and had never been fired from a job. Plaintiff wrote she did not handle stress well, but she could manage changes in routine. Plaintiff had not "noticed any unusual behavior or fears." Plaintiff required the use no assistive devices (128).

On August 30, 2005, Plaintiff presented to Dr. Rezba with complaints of back pain with increased symptoms into her left leg to her foot. Plaintiff stated she experienced numbness and that her leg gave away. Plaintiff was medicating with Feldene, Lasix, and Darvocet. Dr. Rezba scheduled Plaintiff for an epidural steroid injection at L5-S1. Dr. Rezba diagnosed lower back pain and instructed Plaintiff to return in four months. (R. 219).

On September 14, 2005, Susan L. Garner, M.D., completed an Internal Medicine Examination of Plaintiff. Plaintiff stated she was in "her usual state of health until May of 2004, when she began experiencing low back pain." Plaintiff reported she had no injury to cause the pain, but that it was "a spontaneous onset of pain." Plaintiff informed Dr. Garner that she had not been hospitalized for her back condition. Plaintiff described her pain as being located in her tail bone, with radiation to her left buttock. Plaintiff's pain was cramping; caused numbness and tingling in her left lower extremity; constant; caused weakness and gait problems in the left lower extremity; and caused her to fall. Plaintiff informed Dr. Garner that her four-month long physical therapy sessions caused her pain to be worse. Plaintiff said that lifting, sitting, or standing made her pain worse and that she could not lift more than five pounds (R. 204). Plaintiff stated that she was unable to drive due to back pain (R. 208).

Dr. Garner reviewed Plaintiff's May, 2004, MRI of her lumbar spine and noted there was a mild central bulge of the L5-S1 disk (R. 205). Dr. Garner also reviewed the x-ray of Plaintiff's lumbar spine, which was normal (R. 206).

Dr. Garner's examination of Plaintiff revealed the following: Plaintiff's gait was normal; she had no difficulty rising from a seated position or climbing up on and down from the examining table; Plaintiff appeared comfortable when seated and in the supine position. Plaintiff's height was

recorded as five feet, three inches and her weight was 178 pounds.[1] Plaintiff's blood pressure was 166/78. Dr. Garner's examinations of Plaintiff's HEENT, neck, chest, extremities, cardiovascular system, abdomen, cervical spine, hands, knees, ankles, and feet were normal (R. 206-07). Plaintiff's grip strength was thirty-two pounds of force on the right and thirty pounds of force on the left. Plaintiff's lumbosacral spine/hips examination revealed tenderness in the area of approximately L5. Plaintiff could bend forward at the waist to seventy-five degrees; she could laterally flex to twenty-five degrees on the right and ten degrees on the left. Plaintiff's straight leg raising test was "diminished to 30 degrees on the right and 10 degrees on the left." Flexion was normal on the right and "mildly decreased" to seventy-five degrees on the left. Plaintiff's neurologic examination showed "mild weakness on manual muscle testing in the right and lower extremities, graded 4/5." Sensation was intact. Extremity measurements were equal, bilaterally. Plaintiff's biceps, triceps, patellar, and Achilles deep tendon reflexes were graded at 2+/4+ bilaterally (R. 207).

Plaintiff could heel-to-toe walk, heel walk and toe walk, but complained of pain in the left lumbar gluteal region. Plaintiff could squat partially (R. 208).

Dr. Garner diagnosed chronic lumbar pain with radiculopathy and bulging disk (R. 208).

On September 22, 2005, Ginger Biddle, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff (R. 210-17). Dr. Biddle found Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 211). Dr. Biddle found Plaintiff was frequently limited

---

[1]Plaintiff's height was previously noted as five feet, five inches. *See* p. 177 in the transcript.

in her ability to climb ramps and stairs, balance, kneel, and crawl; Plaintiff was occasionally limited in her ability to stoop, crouch, and climb ladders, ropes, and scaffolds (R. 212). Dr. Biddle found Plaintiff had no manipulative, visual, or communicative limitations (R. 213-14). Plaintiff was unlimited in her exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation; she should avoid concentrated exposure to extreme cold, extreme heat, and hazards, according to Dr. Biddle (R. 214).

On November 2, 2005, Dr. Rezba wrote a letter, directed "To Whom It May Concern." He wrote that Plaintiff had injured her back in May 2004 when she fell and that she experienced severe pain in her lower back and left-leg buckling. Dr. Rezba also wrote that Plaintiff informed him that during her pregnancy in 2001, "the fetus was laying on her left sciatic nerve" which caused, since the deliver of her baby, her legs to go "out on her" (R. 218).

Dr. Rezba noted Plaintiff's 2004 lumbosacral spine x-ray was negative and her MRI scan showed "central bulging of the L5 sacral disc with possible annular tear." He also noted that Plaintiff's EMG, NCV studies, CBC, Chem-14 studies, and thyroid studies were normal. Dr. Rezba wrote that his examination showed "continuing pain in her lower back with marked tenderness." He wrote that Plaintiff was significantly limited in her motion, especially in flexion and lateral bending and that she had significant tenderness around her sacroiliac joints. Plaintiff also experienced swelling in her legs, particularly the left leg. Dr. Rezba noted Plaintiff treated her pain with Darvocet. He opined that Plaintiff was, "at the present time . . . totally disabled from any and all gainful employment, even on a part-time sedentary basis" (R. 218).

On January 16, 2006, Cynthia M. Osborne, M.D., a state-agency physician, completed a Physician Residual Functional Capacity Assessment of Plaintiff (R. 232-39). She found Plaintiff

could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 233). Dr. Osborne found Plaintiff could occasionally climb ramps and stairs; climb ladders, ropes, and scaffolds; stoop; kneel; crouch; and crawl. Dr. Osborne found Plaintiff could never balance (R. 234). Plaintiff was found to have no manipulative, visual or communicative limitations (R. 235-36). Dr. Osborne found Plaintiff was unlimited in her exposure to extreme cold and heat, wetness, humidity, noise, vibrations, fumes, odors, dusts, gases, and poor ventilation. Dr. Osborne found Plaintiff should avoid concentrated exposure to hazards (R. 236). Dr. Osborne noted Plaintiff's record showed she had no atrophy, had normal gait, was able to heel-toe walk, could care for her child, needed no assistance with activities of daily living, had "mild" reduced lower extremity strength, and was obese (R. 237). Dr. Osborne considered Dr. Rezba's November, 2005, opinions that Plaintiff had "'continuing chronic pain & L leg pain" and was "totally disabled from any & all employment . . . " (R. 238). Dr. Osborne wrote that Plaintiff's "complaints [were] out of proportion to findings & partially credible" (R. 237). Dr. Osborne found Plaintiff's medical records did "not support an inability to work" and that Plaintiff "should be capable of light level of work" (R. 238). She reduced Plaintiff's RFC to light (R. 238).

On March 7, 2006, Plaintiff presented to Dr. Rezba with complaints of chronic back pain. She stated there was no real change in her condition and she experienced "off and on" numbness. Plaintiff informed Dr. Rezba that she thought she was capable of engaging in lighter sedentary work. Dr. Rezba diagnosed chronic lumbar disc disease and prescribed Darvocet, Feldene, and Lasix. Dr. Rezba instructed Plaintiff to return to his care in three months (R. 250).

On March 20, 2006, Dr. Rezba completed a Medical Assessment of Physical Ability to do Work-Related Activities of Plaintiff (R. 240-41, 251-52). He found Plaintiff could lift and carry ten pounds at one time and could frequently lift and carry ten pounds. Dr. Rezba opined Plaintiff could stay on her feet for one hour at a time; could stand and walk for three hours in an eight-hour workday; could sit for one hour at a time; could sit for a total of four hours in an eight-hour workday; and could alternate between sitting and standing without having to lie down for eight hours in an eight-hour workday. Dr. Rezba expressed no opinion as to whether Plaintiff needed bed rest during an eight-hour workday. Dr. Rezba found Plaintiff could use her hands for simple grasping, could use her fingers for fine manipulations, could push/pull with her arms, and could push/pull with her right leg, but not her left leg. Dr. Rezba opined that"chronic lumbar disc disease" and a "need to break up routine" were the reasons Plaintiff could not sustain actions with her hands, legs, and feet for eight-hours per day. Dr. Rezba found Plaintiff could never bend, crawl, or climb ladders. Plaintiff could occasionally squat, climb stairs, and, "for short periods of time," reach (R. 240, 251). Dr. Rezba opined Plaintiff's limitations as to unprotected height exposure and to marked changes in temperature and humidity were severe. Plaintiff's limitations as to being around moving machinery and exposure to dust and fumes were moderate. Dr. Rezba found Plaintiff's limitation as to driving automotive equipment was mild, with a "sit down only" option (R. 241, 252).

Dr. Rezba wrote he believed Plaintiff's complaints of pain. The objective evidence on which he relied for making his assessment of Plaintiff was a central bulging L5-S1 disc, chronic lower back pain, restricted range of motion of her back, and "neg neuro." Dr. Rezba opined Plaintiff's ability to perform activities would be further reduced by pain and that Plaintiff's pain was present when she was not exceeding activities listed in the evaluation. Dr. Rezba found Plaintiff's pain was

"frequently debilitating." Dr. Rezba noted that Plaintiff was more limited on some days than other days due pain caused by "further bulging of disc." Dr. Rezba noted Plaintiff had been functioning at her current level since her 2001 pregnancy. Dr. Rezba listed Plaintiff's May, 2004, MRI as the "main clinical and laboratory finding" which supported the limitations (R. 241, 252).

Also on March 20, 2006, Dr. Rezba completed a Low Back Residual Functional Capacity Questionnaire of Plaintiff (R. 242-45, 253-56). Dr. Rezba noted he had been treating Plaintiff for three to six months for chronic lower back pain with lumbar disc disease. Dr. Rezba opined Plaintiff's prognosis was guarded. Her symptoms were muscle spasm, extremity pain and numbness, difficulty walking, muscle weakness, "pain primarily," and reduced range of motion. Dr. Rezba listed reduced range of motion and a positive MRI scan as the clinical findings, laboratory and test results which showed Plaintiff's impairments. Dr. Rezba noted Plaintiff experienced "constant chronic dull ach [sic] with nonspecific L leg radiation," "recurrent tingling in L leg," and "occ. sharp spasms in back and down L leg." Dr. Rezba also noted that emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations (R. 242, 253). Dr. Rezba noted Plaintiff's symptoms had lasted or would last for twelve months and were consistent with her impairments. Dr. Rezba opined Plaintiff's symptoms were severe enough to frequently interfere with her attention and concentration and that the medications Plaintiff took to treat her conditions caused drowsiness, "stomach upset," and poor concentration (R. 243, 254).

Dr. Rezba opined Plaintiff could walk for five city blocks without resting or experiencing severe pain; could sit for two hours at a time; could stand for one hour at a time; could stand/walk for about two hours in an eight-hour workday; and could sit at least six hours in an eight-hour workday. Dr. Rezba found Plaintiff needed to include periods of walking during an eight-hour

14

workday (R. 243, 254). Plaintiff needed, according to Dr. Rezba, to walk every forty-five minutes for five minutes. Dr. Rezba opined Plaintiff needed a job that permitted shifting positions at will from sitting, standing, and walking and needed one to two unscheduled, fifteen minute breaks during the work week. Dr. Rezba found Plaintiff did not need to elevate her legs while sitting and did not need to use an assistive device. Dr. Rezba found Plaintiff could frequently lift ten, or less than ten, pounds and could occasionally lift twenty pounds but could never lift fifty pounds. Dr. Rezba found Plaintiff had no significant limitations with repetitive reaching, handling, or fingering (R. 244, 255) Dr. Rezba opined Plaintiff could never bend or twist at the waist during an eight-hour workday, except to change positions. Dr. Rezba did not opine if Plaintiff's conditions would cause bad and good days; he opined, however, that Plaintiff would need to be absent from work about three times a month for treatment or as a result of her impairment. Dr. Rezba listed no other limitations that would cause Plaintiff to not work. He noted Plaintiff had been functioning at the described level "at least since [he] first saw her on September 8, 2004" (R. 245, 256).

On May 24, 2006, Plaintiff informed Dr. Rezba that there was no "real change" to her lower back condition, "other than periodic flare-ups." Plaintiff's condition was listed as "stable." Plaintiff stated she experienced left leg numbness. Dr. Rezba prescribed Darvocet, Lasix, and Feldene. He diagnosed chronic lumbar disc disease and instructed Plaintiff to return in four months (R. 249).

Appeals Council

On December 20, 2006, Plaintiff presented to Dr. Rezba with complaints of increased lower back pain. Plaintiff stated she had fallen one month earlier and experienced soreness over her lateral clavicle/shoulder. Dr. Rezba opined he did not think Plaintiff "did anything significant" by way of injuring her shoulder and it was his opinion that Plaintiff's shoulder would "just get better." The x-

rays showed no fractures of the shoulder. Dr. Rezba diagnosed chronic lower back pain and contusion to right shoulder; he prescribed Lorcet, Feldene, and Lasix (R. 265).

<u>Administrative Hearing</u>

On December 6, 2006, the ALJ conducted an administrative hearing relative to Plaintiff's claim of disability. Plaintiff testified she was five feet, three inches tall and weighed one-hundred, eighty-five pounds. Plaintiff stated she had never been a licensed driver. Plaintiff stated her mother had driven her to the hearing, which took about two and one-half hours, and during which she had to shift positions to "try[] to get comfortable in the vehicle" (R. 41). Plaintiff stated that during her 2001 pregnancy, the fetus lay on her sciatic nerve, which caused her current pain (R. 42). Plaintiff stated she has a bulging disc which caused nerve damage (R. 45). Plaintiff testified she experienced leg numbness, not being able to stand for long periods of time, and falling down (R. 45, 60). Plaintiff testified she treated her back pain with Darvocet, from which she experienced no adverse effects and from which she did "sometimes" realize relief from pain, and heating pads; physical therapy did not improve her condition (R. 47, 49). Plaintiff stated her doctor did not recommend surgery; her physician told her that if he "cut[] on [her] it could paralyze [her]" (R. 48, 61). Plaintiff described her pain as in her low back and constant, with radiation to left leg (R. 48). Plaintiff stated walking and standing for long periods of time cause her pain to worsen (R. 49). Plaintiff stated she had no mental condition of which she was aware (R. 46). Plaintiff testified she could not read or understand "big words" and was confused by "money changing" when she purchased goods in a store. Plaintiff stated she graduated from high school with a regular diploma (R. 42). Plaintiff testified her memory was "okay" and she watched television (R. 51-52).

Plaintiff stated she began working in 2003 and stopped working in 2004 because she

"couldn't lift the water bucket and stuff to clean the rooms" (R. 43, 46). Plaintiff testified her job responsibilities also included serving snacks to patients, making beds, pushing patients in wheelchairs, moving furniture and lifting containers of water (R. 58-59). Plaintiff stated her work responsibilities were "really hard on [her] back and . . . [were] really starting to pull and everything on [her] back" (R. 59). Plaintiff stated she could walk one mile on ground level without stopping and could stand for about ten or twenty minutes (R. 49-50). Plaintiff stated she could not bend due to pain and could not squat due to pain. Plaintiff testified she had difficulty making fists with her hands and that she had no feeling in them, but that she could hold a fork and spoon and dress her child (R. 50-51). Plaintiff stated she could not lift her child, who weighed thirty-five pounds, but limited her lifting to five pounds. Plaintiff testified she could sit for forty-five to fifty minutes (R. 51). Plaintiff stated she slept for five hours per night (R. 53, 60). Plaintiff testified she would "doze off" during the day, but she did not sleep in the day (R. 61).

Plaintiff testified she could care for her personal needs only on "some days" because she had difficulty stepping up into the shower (R. 53). Plaintiff stated she did not cook for her family and that her husband did (R. 54). Plaintiff testified she rose at 6:30 a.m. to supervise her son as he got ready for school (R. 55). Plaintiff stated she "mostly just [sat] around, watch[ed] TV, and [got] up to go to the bathroom" during the course of the day (R. 55). Plaintiff testified she worked on plastic canvases as a hobby; she stated her husband completed the household chores. Plaintiff testified she grocery shopped with her husband once or twice a month (R. 56). Plaintiff attended one PTA meeting. Plaintiff visited with her mother daily at Plaintiff's home. Plaintiff belonged to no clubs or organizations (R. 57-58).

The ALJ asked the VE the following hypothetical question:

If such an individual (between the ages of 27 and 29, defined as a younger individual, with a regular high school education, with past work experience at the light to medium, unskilled) needs to alternate between sitting and standing periodically throughout the workday even though the limitation would be to light work at lighting [sic] 20 pounds occasionally, 10 pounds frequently, but needed to change positions frequently during the work day at the work station and by frequent I mean at least 10 minutes of every hour or an hour alternating and the posturals would be as previously assigned, occasionally climb ladders, ropes and scaffolds, stoop and crouch and avoid concentrated exposure to temperature extremes of heat and cold and the hazards of moving plant machinery and unprotected heights. Looking at the past work that you indicated was available if the Claimant worked for this hypothetical individual would be available, would the hospitality work still be possible with that sit/stand option requirement? (R. 62-63).

The VE responded that he did not "believe it would be . . ." (R. 63).

The ALJ then asked the following: "All right. Now then I need to ask you would there be jobs in the national and regional economy such as individual could perform with the light sit/stand option requirement and the posturals as previously identified for a hypothetical individual . . . ." The VE responded as follows: "At the light exertional level . . . mail clerk. That's in private business, 202,000 nationally, 2,300 regionally. . . . A price marker, 319,000 nationally, 1,675 regionally and because of the sit/stand, bing able to alternate that type of position as included in the hypothetical I'd reduce those numbers in half" (R. 64).

The VE, at the ALJ's direction, reviewed Dr. Rezba's March 20, 2006, Medical Assessment of Physical Ability to do Work-Related Activities and Low Back Residual Functional Capacity Questionnaire of Plaintiff. The ALJ asked the VE to opine "whether or not it [the opinions as to limitations expressed in the assessment and the questionnaire] would allow for work and if so at what exertional levels" (R. 65). The VE testified he "[thought] the medical assessment of physical ability indicated a sedentary type of position . . . . There are a couple of things included in the report that as a vocational person I would be concerned about. What I would [be] concerned about mostly

is the number of days she would miss during the month. I don't know that she could be in competitive employment if she missed more than two days per month and also I noticed in here that it indicates she would have to take additional breaks during the day. Some employers will tolerate that. It depends on how long those breaks may be. If they're just five minute breaks or something like that, the individual usually is allowed to take an additional five minutes or whatever but it's longer than 15 minutes, employers really have a problem with that . . ." (R. 65-66).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ Mills made the following findings:

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2004.

2. The claimant has not engaged in substantial gainful activity since October 1, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571, et seq., 416.920(b) and 416.971 et seq.).

3. The claimant has the following severe impairments: a bulging disc at L5-S1 with lumbar pain and radiculopathy (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. Based on all available evidence, the undersigned finds that the claimant retains the residual functional capacity to perform the exertional demands of light work, or work which requires maximum lifting of twenty pounds and frequent lifting ten pounds; some light jobs are performed while standing, and those performed in the seated position often require the worker to operate hand or leg controls. (20 C.F.R. §§ 404.1567 and 416.967). In addition the claimant has the following exertional and non-exertional limitations: she must have a sit/stand option every hour, with the ability to change positions frequently (for 10 minutes of every hour); she can do postural movements occasionally, such as stooping, crouching, or climbing ladders, ropes, or scaffolds; she must avoid working in areas of extreme heat or cold; she cannot work around environmental hazards such as dangerous, moving plant

machinery or around unprotected heights.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on August 18, 1977, and was 27 years old, which is defined as a "younger individual," on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.

1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

The Plaintiff contends:

1.  The ALJ failed to properly evaluate Plaintiff's low back impairment under Listing 1.04.

2.  The ALJ failed to consider Plaintiff's obesity.

3.  The ALJ failed to properly evaluate Plaintiff's RFC along with the opinion of her treating physician.

4.  The ALJ failed to properly evaluate Plaintiff's daily activities.

The Commissioner contends:

1.  The ALJ correctly determined that Plaintiff's lumbar spine impairment did not satisfy the requirements of Listing 1.04.

2.  Remand for consideration of Plaintiff's obesity is not necessary.

3.  The ALJ correctly found Plaintiff retained the ability to perform a limited range of light work.

4.  The ALJ correctly found that Plaintiff's subjective complaints were not entirely credible.

## C. Listing 1.04

Plaintiff contends the ALJ failed to properly evaluate her low back impairment under Listing 1.04. Defendant asserts the ALJ correctly determined that Plaintiff's lumbar spine impairment did not satisfy the requirements of Listing 1.04.

The requirements, in part, of Listing 1.04 are as follows:

**1.04 *Disorders of the spine*** (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt. 404, subpt. P, app.1, §1.04

The ALJ found the following as to Plaintiff's spinal impairment.

The claimant's physical impairments have been considered under Listing 1.04. The objective medical evidence does not show that the claimant has nerve root compression with limitation of motion of the spine, motor loss with sensory or reflex loss, evidence of inflamed arachnoidal tissue resulting in the need for a change of position or posture every two hours, or evidence of stenosis that results in an inability to ambulate effectively (R. 24).

In making this decision, the ALJ relied on the May 5, 2004, spinal x-ray, which showed normal results; the May 12, 2004, MRI of Plaintiff's lumbar spine, which showed unremarkable results, except for a "'mild central bulge of L5-S1 disc' that was 'sufficient to just gently indent the ventral aspect of the disc' with a notation that it was 'contiguous with the right S1 root, but does not produce any mass defect or deformity, and the finding is of questionable significance'" (R. 21).

Additionally, the ALJ considered Dr. Rezba's September 8, 2004, opinion that Plaintiff's May, 2004, MRI did not show any "contact of the bulging disc, neural sac or nerve root, and that none of the anatomy was displaced," and his March 7, 2006, opinion that Plaintiff did not "have anything on the MRI scan other than a mild central bulge, L5-S1" (R. 22, 23). This evidence of record does not show that Plaintiff had nerve root compression as a result of her mild bulging disc at L5-S1. The regulations require that a herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture must result in compromise of a nerve root (including the cauda equina) or the spinal cord. Plaintiff's spinal cord was not compromised. The May, 2004, MRI showed that the bulge was contiguous with the right S1 root, but it did not show compression. Indeed, it did not show any mass effect or deformity. Additionally, Dr. Rezba, Plaintiff's treating physician, did not make a finding of nerve root compression. "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 110 S.Ct. 885 (1990). The ALJ's decision that the "objective medical evidence [did] not show that the claimant had nerve root compression" and that Plaintiff did not meet Listing 1.04 is supported by substantial evidence.

The Regulation lists the symptoms associated with nerve root compression. An individual who meets Listing 1.04A must experience neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) due to nerve root compression. In addition to Plaintiff not having been diagnosed with nerve root compression caused by her bulging disc, she did not

23

display all the symptoms mandated by the regulations in order to meet Listing 1.04A. The ALJ evaluated the evidence relative to Plaintiff's symptoms and limitations caused by her back pain.

The ALJ considered the state-agency's physician's February 8, 2005, finding that Plaintiff had mild weakness, had limited range of motion, and had positive straight leg rasing tests (R. 22). The ALJ also considered Dr. Rezba's November 2, 2005, opinion that Plaintiff had limited range of motion in her back and his March 7, 2006, opinion that Plaintiff experienced continued back pain (R. 23). Plaintiff was not, however, diagnosed with sensory or reflex loss, as required by the Regulation. Plaintiff had no sensory loss on June 25, 2004, when examined by a physician's assistant at E.A. Hawse Health Center (R. 159). Plaintiff was neurologically intact on July 23, 2004 (R. 157). On September 8, 2004, Dr. Rezba found Plaintiff's reflex motor sensory exam was normal (R. 156). The ALJ noted that Dr. Rezba diagnosed "'off and on numbness, left leg,'" on March 7, 2006. On September 14, 2005, Dr. Garner found Plaintiff's sensation was intact and her deep tendon reflexes were 2+/4+ bilaterally (R. 207). The record of evidence does not contain any finding that Plaintiff experienced sensory or reflex loss, as required to meet Listing 1.04A. The ALJ's opinion, therefore, is supported by substantial evidence.

Finally, Plaintiff argues that the ALJ failed to conduct an appropriate analysis, as mandated by *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986), in that he did not list the "reasons underlying a determination of whether" Plaintiff met or equaled a listed impairment and failed to "state all of the particular requirements of each subsection of Listing 1.04" (Plaintiff's brief at p. 8). As noted above, the ALJ did support his finding that the Plaintiff did not meet Listing 1.04 by considering, weighing, and analyzing the evidence of record. The ALJ considered the MRI, which showed a bulging disc at L5-S1, and the x-ray, which was normal. The ALJ considered the opinions

of Dr. Rezba, Plaintiff's treating physician, and Dr. Garner, the state-agency examining physician.

Additionally, the ALJ is not required to analyze each subsection of Listing 1.04. An ALJ can, in accord with the language is 20 C.F.R. pt. 404, subpt. P, app.1, §1.04, address either Subsection A "or" Subsection B "or" Subsection C. The ALJ correctly analyzed Subsection A because Plaintiff had been diagnosed with lumbar disc disease by Dr. Rezba on March 7, 2006, and nerve root compression was in issue; however, Plaintiff had never been diagnosed or treated for spinal arachnoiditis, as addressed in Subsection B of Listing 1.04, or lumbar spinal stenosis, as addressed in Subsection C of Listing 1.04. Analysis of Plaintiff's symptoms to those subsections was unnecessary. The instant case is distinguishable from *Cook* in that the ALJ in that case failed to "compare Cook's symptoms" to any of the four possible listings – 1.02, 1.03, 1.04, 1.05 – that applied to Plaintiff's arthritis. *Id.* at 1173. The Fourth Circuit found the ALJ failed to explain which of the listings were considered relevant in his analysis of Cook's joint condition; the Fourth Circuit did not opine that each subsection of one listing must be addressed in an analysis. The ALJ in the instant case did state, in his decision, that he analyzed Plaintiff's symptoms in conjunction with Listing 1.04. The ALJ was correct in weighing and considering the evidence relative to Listing 1.04A and substantial evidence supports the ALJ's decision.

### D. Obesity

Plaintiff contends the ALJ failed to consider Plaintiff's obesity; Defendant contends remand for consideration of Plaintiff's obesity is not necessary.

The record contains evidence that Plaintiff was five feet, three inches tall and weighed between 167 and 185 pounds (R. 177, 41). Plaintiff contends that the National Institute of Health classifies someone at that height and weight as having a body mass index of thirty-two and that SSR

02-01p classifies an individual with a thirty-two BMI as being obese and requires "consideration of obesity where the claimant's impairment is severe" (Plaintiff's brief at p. 11). Consideration of obesity in the sequential evaluation is only one of the mandates of SSR 02-01p. SSR 02-01p also outlines how obesity is identified as a medically determinable impairment by an ALJ. It is that section, specifically, paragraph 4, that is relevant to this particular case.

SSR 02-01p, holds, in part, that:

> 4. How Is Obesity Identified as a Medically Determinable Impairment?
>
> When establishing the existence of obesity, we will generally rely on the judgment of a physician who has examined the claimant and reported his or her appearance and build, as well as weight and height. Thus, in the absence of evidence to the contrary in the case record, we will accept a diagnosis of obesity given by a treating source or by a consultative examiner. However, if there is evidence that indicates that the diagnosis is questionable and the evidence is inadequate to determine whether or not the individual is disabled, we will contact the source for clarification, using the guidelines in 20 CFR 404.1512(e) and 416.912(e).
>
> When the evidence in a case does not include a diagnosis of obesity, but does include clinical notes or other medical records showing consistently high body weight or BMI, we may ask a medical source to clarify whether the individual has obesity. However, in most such cases we will use our judgment to establish the presence of obesity based on the medical findings and other evidence in the case record, even if a treating or examining source has not indicated a diagnosis of obesity. Generally, we will not purchase a consultative examination just to establish the diagnosis of obesity.
>
> . . .

Plaintiff was never diagnosed with or treated for obesity. Dr. Rezba, her treating physician beginning on August 9, 2004, treated her over the course of two and one-half years, and he never diagnosed her with obesity (R. 230, 265). He did not recommend or prescribe diet to Plaintiff to help her lose weight; he did not recommend or prescribe exercise to assist Plaintiff in weight loss. Dr. Rezba did not associate her obesity with her low back pain; he did not express an opinion that Plaintiff's limitations were exacerbated or caused by obesity. Plaintiff did not complain to Dr.

Rezba that her weight limited her ability to function or perform activities; she did not state that her weight elevated her symptoms or pain (R. 218-231, 240-45, 249-50, 251-56). The only mention of obesity in the record of evidence was made by a state-agency physician, who noted Plaintiff was "+ obesity," was partially credible, and had a RFC of light (R. 237). The state-agency physician also noted that the medical record she reviewed did "not support an inability to work" (R. 238).

Dr. Rezba, Plaintiff's treating physician, did not express an opinion that Plaintiff had obesity. It was not the ALJ's responsibility to establish obesity as an impairment. As noted above, SSR 02-01p, paragraph 4, reads that an ALJ *may* ask a medical source to clarify obesity in an individual when the evidence does not include such a diagnosis, but could use his/her own judgment as to the issue of obesity, on a case-to-case basis, based on the evidence or record and would not "generally" purchase a consultative examination to establish obesity in an individual.

There is no language in the Ruling that mandates the ALJ must seek an opinion from a medical source to establish that Plaintiff had obesity. As determined by the use of the word "may," it was the ALJ's prerogative to have done so, but it was not required. Additionally, the ALJ was not mandated to establish obesity when that condition had not been diagnosed by a physician, but was authorized to use his "judgment" in this case and on a case-to-case basis. In this case, the ALJ did not elect to make a diagnosis of basis; this was proper as he was not required to do so. Finally, it is the policy of the Commissioner to "not" purchase consultative examinations to obtain a diagnosis of obesity; therefore, the ALJ in this case was not required to so act.

Since obesity was not diagnosed by a physician and as it is not within the mandated purview of the ALJ to establish obesity as a medically determinable or severe impairment, the ALJ did not err in not considering obesity in his decision and his decision is supported by substantial evidence.

## E. RFC/Treating Physician

Plaintiff contends the ALJ erred in his assessment of the opinion of Dr. Rezba regarding Plaintiff's residual functional capacity; specifically, Plaintiff argues Dr. Rezba's opinion that Plaintiff could sit for only four hours in an eight-hour work day was discounted as being contradictory (Plaintiff's brief at p. 11). Defendant asserts that Plaintiff's argument that the ALJ discounted this opinion of Dr. Rezba "misrepresents the ALJ's discussion of why he gave no significant weight to Dr. Rezba's medical opinion" (Defendant's brief at p. 13).

As to Dr. Rezba's opinions, the ALJ made the following finding:

> The undersigned accords less weight to the opinions of the claimant's physician, Dr. Benjamin Rezba, particularly Exhibits 5F [November 2, 2005, letter, October 11, 2004, February 8, 2005, March 10, 2005, June 7, 2005, and August 30, 2005 treatment notes] and 10F [March 20, 2006, Medical Assessment of Physical Ability to do Work-Related Activities and March 20, 2006, Low Back Residual Functional Capacity Questionnaire]. With regard to the opinions of 5F, Dr. Rezba's opinions are dispositive to the issues *sub judice* (namely that the claimant is disabled and cannot do her past work), and such issues are reserved exclusively to the Commissioner. The undersigned therefore cannot accord the opinion any special significant [sic] or weight for the purposes of determining disability. With regard to Exhibit 10F, the limitations enumerated do not appear to be substantially supported by the other medical evidence of record, the claimant's allegations, or even Dr. Rezba's observation upon examining the claimant. Specifically, Dr. Rezba indicated the following in the claimant's progress records: "I think she's capable of a lighter sedentary work" (Exhibit 9F2) [treatment note of March 7, 2006]. This statement directly opposes his statements before, and less than two weeks after, that the claimant was disabled and could not work (*Compare* Exhibit 9F/2 *with* Exhibits 5F/1 [November 2, 2005, letter], 7F and 10F [March 20, 2006, Medical Assessment of Physical Ability to do Work-Related Activities and March 20, 2006, Low Back Residual Functional Capacity Questionnaire]. Thus Dr. Rezba's opinions at 5F/1, 7F, and 10F are internally inconsistent with his opinion at 9F, inconsistent with the objective medical evidence (such as the MRI showing only a mild LS-S1 disc bulge that was of "questionable significance" (Exhibit 2F/42), normal EMG/NCV reports, and normal X-rays), and inconsistent with the claimant's statements regarding her daily activities (R. 26-27).

The undersigned finds, as did the ALJ, that Dr. Rezba's November 2, 2005, opinion that

28

Plaintiff was "totally disabled from any and all gainful employment, even on a part-time sedentary basis" due to her "continuing chronic back pain and left leg pain" (R. 218) is an opinion that concerns issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.*, that would direct the determination or decision of disability. A statement by a medical source that a claimant is "disabled" or "unable to work" does not mean that the Commissioner will determine that the claimant is disabled. 20 C.F.R. §404.1527(e)(1) expressly provides that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Finally, a "statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." These opinions, therefore, cannot be accorded controlling weight or even any special significance.

20 C.F.R. §404.1527 reads, in part, the following:

(d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.</u> When we do not give the treating source's opinion controlling weight, we apply the

factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (I) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

> (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

As noted by Plaintiff, Dr. Rezba found, in his Medical Assessment of Physical Ability to do Work-Related Activities, dated March 20, 2006, that Plaintiff could sit for a total of four hours in an eight-hour workday (R. 240, 251).

The ALJ evaluated Dr. Rezba's opinion in accord with 20 C.F.R. §404.1527(d). He considered the frequency of examinations by Dr. Rezba and the nature and extent of the treatment relationship between Dr. Rezba and Plaintiff. The ALJ also made a determination as to whether Dr.

Rezba's opinion was supported by the medical signs and laboratory findings. Finally, the ALJ thoroughly evaluated whether Dr. Rezba's opinion was consistent with the record as a whole.

The ALJ noted that Plaintiff was treated by Dr. Rezba approximately every three months and that her condition was treated with Darvocet and a Medrol dosepak "'did help quite a bit'" but Plaintiff did not "appear to have garnered its benefit more than once" (R. 22, 26).

The ALJ also noted that Dr. Rezba's opinion that Plaintiff could sit for four hours in an eight-hour workday was not supported by the MRI, x-ray, and EMG/NCV tests. The ALJ evaluated and considered that Plaintiff's May 5, 2004, x-ray of Plaintiff's spine was normal. He evaluated and considered that Plaintiff's May 12, 2004, MRI of her lumbar spine showed "unremarkable results, except for 'a mild central bulge of L5-S1 disc' that was 'sufficient to just gently indent the ventral aspect of the disc' with a notation that it was 'contiguous with the right S1 root, but does not produce any mass defect or deformity, and the finding is of questionable significance'" (R. 21). The ALJ noted that Plaintiff's September 8, 2004, x-ray of her pelvis for low back pain and left sided radiculopathy was normal (R. 22). The ALJ also evaluated and considered the October 5, 2004, EMG/NCV tests, which were normal and which showed no evidence of left lumbar radiculopathy (R. 22). Additionally, the ALJ considered Dr. Rezba's opinion as to the results of Plaintiff's MRI, which showed no "contact of the bulging disc, neural sac or nerve root" (R. 22). This medical evidence and these laboratory findings support the ALJ's finding as to Dr. Rezba's opinion that Plaintiff could sit for only four hours in an eight-hour work day.

The ALJ conducted an extensive evaluation of the consistency of Dr. Rezba's opinion with the evidence of record that Plaintiff could sit for four hours in an eight-hour workday. Dr. Rezba's opinion was not consistent with Dr. Biddle's September 22, 2005, opinion that Plaintiff could sit

for a total of about six hours in an eight-hour workday or with Dr. Osborne's January 16, 2006, opinions that Plaintiff could sit for a total of about six hours in an eight-hour workday, that Plaintiff's medical records did "not support an inability to work" and that Plaintiff "should be capable of light level of work" (R. 26, 233, 238).

As the ALJ discussed in his decision, Dr. Rezba's opinion as to Plaintiff's ability to sit was inconsistent within his own reports. In his Low Back Residual Functional Capacity Questionnaire of Plaintiff, completed on March 20, 2006, the same date that Dr. Rezba found Plaintiff could sit for four hours in an eight-hour workday, Dr. Rezba found Plaintiff could sit at least six hours in an eight-hour workday (R. 26-27, 244, 255). Additionally, the ALJ considered Dr. Rezba's opinion that Plaintiff could sit for four hours in an eight-hour workday inconsistent with his March 7, 2006, finding that Plaintiff was capable of engaging in lighter sedentary work (R. 26, 250). The ALJ also evaluated the inconsistency of Dr. Rezba's opinions that Plaintiff had "'off and on numbness, left leg'" [March 7, 2006]; "'some leg numbness'"; and "'periodic flair ups' and . . . was 'overall stable'" [May 24, 2006] with his opinion she could sit for four hours in an eight-hour workday (26). Substantial evidence supports the ALJ's decision to not give great weight to the opinion of Plaintiff's treating physician.

The ALJ relied on the opinions of the state-agency physicians in finding that Plaintiff could perform the demands of light work. The ALJ found the following:

> The Social Security Administration also requires the undersigned to consider the findings of fact by the State Agency medical consultants about the nature and severity of the claimant's impairments. The undersigned is not, however, bound by these findings (20 CFR 404.1527 and SSR 96-6p). State Agency physicians completed physical residual functional capacity assessments upon review of the claimant's medical file (Exhibit 4F and 6F). The undersigned has considered these opinions and, to the extent that they show that the claimant's ability to perform exertional work or non-exertional work requirements are not grossly restricted, and to the

extend that the opinions seem consistent with the majority of the objective findings in the medical evidence, the undersigned agrees with them (R. 26).

Specifically, those state-agency physicians, Drs. Biddle and Osborne, found Plaintiff could sit for a period of six hours in an eight-hour workday (R. 211, 233). Additionally, Dr. Osborne found Plaintiff was capable of light work (R. 238). The ALJ did not err in adopting these opinions.

20 C.F.R. §404.1527(I) provides the following:

Administrative law judges are not bound by any finding made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists as opinion evidence, except for the ultimate determination about whether [one is] disabled.

SSR 96-7p holds that

. . . [T]he opinions of State agency medical and psychological consultants and other program physicians and psychologists can be give weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence, including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist. The adjudicator must also consider all other factors that could have a bearing on the weight to which an opinion is entitled, including any specialization of the State agency medical or psychological consultant.

Dr. Biddle's opinion that Plaintiff could sit for a total of six hours in an eight hour workday is supported by Plaintiff's May, 2005, MRI, which was unremarkable except for a mild central bulge at L5-S1; the October 5, 2004, EMG/NCV studies, which were normal; and the February 8, 2005, study for deep vein thrombosis, which was normal. These medical test results were considered by Dr. Biddle. Additionally, Dr. Biddle considered Plaintiff's gait was normal, she appeared

comfortable while seated, and she could bend at the waist. Flexion was mildly decreased on the left. Sensation was intact. She could heel walk and toe walk and heel-to-toe walk. Dr. Biddle considered that Plaintiff cared for her husband and son, cared for her own personal needs, did laundry, rode in a car, grocery shopped monthly, and dusted (R. 217).

Dr. Osborne's opinion that Plaintiff could sit for a total of six hours in an eight-hour workday was supported by Plaintiff's May, 2005, MRI and negative EMG studies, which she weighed and considered. Dr. Osborne's opinion was supported by Plaintiff's gait being normal, her demonstrating no atrophy, her ability to heel-toe walk, Plaintiff's ability to care for her child, her activities of daily living, and her not requiring assistance with personal needs (R. 237). Dr. Osborne also noted Plaintiff's medical records did not support an inability to work (R. 238).

The ALJ's decision to reduce Plaintiff's RFC to light is supported by the evidence.

### F. Credibility

Plaintiff contends the ALJ failed to properly evaluate Plaintiff's daily activities; Defendant asserts the ALJ correctly found that Plaintiff's subjective complaints were not entirely credible. Plaintiff asserts that, 20 C.F.R. §404.1529(c)(3)(1) mandates that, in "evaluating pain, [the] factors relevant to [her] symptoms, such as pain, . . . [that] must be considered include the [Plaintiff's] daily activities (Plaintiff's brief at p. 13).

20 C.F.R. §404.1529(c)(3) reads as follows:

(c) *Evaluating the intensity and persistence of your symptoms, such as pain, and determining the extent to which your symptoms limit your capacity for work*—

(1) *General.* When the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain, we must then evaluate the intensity and persistence of your symptoms so that we can determine how your symptoms limit your capacity for

work. In evaluating the intensity and persistence of your symptoms, we consider all of the available evidence, including your history, the signs and laboratory findings, and statements from you, your treating or nontreating source, or other persons about how your symptoms affect you. We also consider the medical opinions of your treating source and other medical opinions as explained in §404.1527. Paragraphs (c)(2) through (c)(4) of this section explain further how we evaluate the intensity and persistence of your symptoms and how we determine the extent to which your symptoms limit your capacity for work, when the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain.

. . .

(3) *Consideration of other evidence.* Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. The information that you, your treating or nontreating source, or other persons provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator of the intensity and persistence of your symptoms. Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which you, your treating or nontreating source, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled. We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating or nontreating source, and observations by our employees and other persons. Section 404.1527 explains in detail how we consider and weigh treating source and other medical opinions about the nature and severity of your impairment(s) and any related symptoms, such as pain. Factors relevant to your symptoms, such as pain, which we will consider include:

(I) Your daily activities;

(ii) The location, duration, frequency, and intensity of your pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

. . .

The Regulation calls for several categories of evidence to be evaluated and weighed, not just daily activities. The ALJ in the instant case complied. Not only did he properly evaluate Plaintiff's activities of daily living in regard to her pain, he evaluated and weighed the objective medical evidence; the statements of the physicians who treated or examined Plaintiff; the location, duration, frequency and intensity of her pain; factors that aggravated Plaintiff's symptoms; and the medication and the measures Plaintiff took to relieve her symptoms.

The ALJ made the following finding as to Plaintiff's credibility:

Because a claimant's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the undersigned must consider in addition to the objective medical evidence when assessing the credibility of the claimant's statements:

1.  The claimant's daily activities;
2.  The location, duration, frequency, and intensity of the claimant's pain or other symptoms;
3.  Factors that precipitate and aggravate the symptoms;
4.  The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;
5.  Treatment, other than medication, the claimant receives or has

36

received for relief of pain or other symptoms;

6.     Any measure other than treatment the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.     Any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms (SSR 96-7p).

The undersigned finds that the claimant is not entirely credible with regard to her pain, limitations or overall disability. The claimant has alleged several serious falls that have exacerbated her pain, if not her back impairments. The objective medical evidence, however, does not appear to account for these alleged falls, or any clinical observation of any residual physical effects of these falls (i.e., fractures, bruises, or complaints from the claimant). The claimant's subjective allegations are not supported by her daily activities. Although the claimant has alleged severe pain by activities that last significant periods of time, she [is] able to care for herself, and her family, including a young child, clean house, and enjoy activities such as needlepoint, which would necessarily require maintenance of a still posture for detailed manual work. The claimant has been prescribed significant pain medication, but sees her physician only one in every three months or so for her back pain, which her physician once described as an "ache," that she felt numbness "off and on," and that she suffered only "periodic flair-ups" (Exhibits 9F/1-2). The claimant reported good results from using a Medrol dosepak, but does not appear to have garnered its benefit more than once. After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible and only fair at best (R. 25-26).

Plaintiff specifically contends the ALJ "failed to properly analyze Plaintiff's description of her daily activities in evaluating her pain" in that he "noted that claimant could care for herself and her son, cook, clean dishes, do laundry, go grocery shopping and do light cleaning" and that "her subjective allegations were not supported by her daily activities" but that the information provided by Plaintiff on her July 23, 2005, Function Report – Adult and her testimony at the hearing "reveal quite a different picture than that portrayed by the ALJ" (Plaintiff's brief at pp. 13, 14).

The activities of daily living, listed and considered by the ALJ, were gleaned by him from

the record of evidence. The ALJ considered both Plaintiff's responses on the Function Report Adult and the questions posed to her at the administrative hearing. In the July 23, 2005, Function Report – Adult, Plaintiff listed her activities of daily living as follows: prepared and ate three meals per day; washed dishes; did laundry weekly; and "straight[ened] up living room." Plaintiff wrote she rested after each meal and after completing daily chores by sitting down (R. 122). Plaintiff wrote she cared for, in addition to herself, both her husband and her son. Plaintiff noted she had "no problem" in caring for her personal needs (R. 123). Plaintiff wrote it took two hours to prepare the three meals per day, and the impact of her condition on this chore was she "slow[ed] down a lot." Plaintiff listed the following as completion times for household chores: two days to complete laundry; two hours to dust living room; and one day to clean bathroom. Plaintiff could not vacuum (R. 124). Plaintiff wrote she rode in a car and shopped for groceries once a month, for four hours at a time. Plaintiff could pay bills, count change, handle a savings account, and use a checkbook and money orders (R. 125). Plaintiff "work[ed] on plastic canvas" every day as a hobby (R. 126). The ALJ adopted these statements by Plaintiff as to her activities of daily living.

At the Administrative Hearing, Plaintiff testified that she had difficulty caring for her personal needs on "some days" because she had difficulty stepping up into the shower. Her husband did "the biggest part" of cooking meals. In conjunction to meals, she testified her son ate breakfast and lunch at school. Plaintiff rose at 6:30 a.m. to "get [her son] ready for school." Plaintiff testified she "mostly just [sat] around, watch[ed] TV, and [got] up to go to the bathroom" during the course of the day. She worked on plastic canvases as a hobby. Plaintiff testified she did "nothing much" relative to the housework and that her "husband [did] most of it . . . ." Plaintiff stated she did laundry and that her husband assisted her with that chore. Plaintiff grocery shopped with her

husband once or twice a month; attended a PTA meeting; visited with her mother daily in her own home; but did not play with her son (R. 53-57). In his listing and analysis of Plaintiff's activities of daily living, the ALJ accurately included those activities Plaintiff said she could do – she testified she cared for her personal needs; she testified she cared for her family, including her young child; she testified that she did "nothing much" in the way of housework; she testified she did needlework. The testimony of Plaintiff was included in the ALJ's credibility analysis of her activities of daily living.

As is evident in the ALJ's decision relative of Plaintiff's ability to do activities, the ALJ did not base his opinion as to Plaintiff's credibility exclusively on her activities. The ALJ weighed those statements of what she could do to the objective medical evidence; the location, duration, frequency, and intensity of her pain; the factors that aggravated her symptoms; the effects of her medications and treatments; and what measures Plaintiff took to treat her pain.

The ALJ considered the following objective medical evidence:

- X-ray of Plaintiff's spine, dated May 5, 2004, was normal (R. 21);

- May 12, 2004, MRI of lumbar spine showed unremarkable results, except for "a mild central bulge of L5-S1 disc" that was "sufficient to just gently indent the ventral aspect of the disc" with a notation that it was "contiguous with the right S1 root, but does not produce any mass defect or deformity, and the finding is of questionable significance" (R. 21);

- On February 8, 2005, Plaintiff's gait was normal and she had no difficulty rising from a seated position and/or climbing up and down from the examination table (R. 22);

- Plaintiff's Duplex scan was normal on February 8, 2005, and she had no sign of deep venous thrombosis (R. 22).

The ALJ also considered objective medical evidence as to the exacerbation of Plaintiff's pain caused by her falling. He found the objective medical evidence did not "appear to account for these alleged

falls, or any clinical observation of any residual physical effects of these falls (i.e., fractures, bruises, or complaints from the claimant)" (R. 26).

The ALJ considered Dr. Rezba's descriptions of Plaintiff's pain "as an 'ache,' that she felt numbness 'off and on,' and that she suffered only 'periodic flare-ups'" in weighing Plaintiff's location, duration, frequency, and intensity of her pain. The ALJ considered the effects of her medications by analyzing the fact that Plaintiff took "significant pain medication, but [saw] her physician only once in every three months or so for her back pain." The ALJ also considered the effects of the treatments Plaintiff received for her pain and what measures Plaintiff took to treat her pain when he noted Plaintiff "reported good results from using a Medrol dosepak," but did not "appear to have garnered its benefit more than once" (R. 26).

In addition to considering the above evidence in conformance with 20 C.F.R. §404.1529(c)(3) in making a credibility determination, the ALJ also noted inconsistencies in the evidence of record, especially in Plaintiff's statements, as mandated in SSR 96-7p, which holds, in part, the following:

> One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record. The adjudicator must consider such factors as:
>
>> The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.
>>
>> The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). The adjudicator must also look at statements the individual made to SSA at each prior step of the

administrative review process and in connection with any concurrent claim or, when available, prior claims for disability benefits under titles II and XVI. Likewise, the case record may contain statements the individual made in connection with claims for other types of disability benefits, such as workers' compensation, benefits under programs of the Department of Veterans Affairs, or private insurance benefits. However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

Plaintiff claimed she could not tolerate physical therapy, but the ALJ noted she had been "able to tolerate moderate exercise" prior to physical therapy (R. 22). Additionally, the record contains a June 25, 2004, assertion by Plaintiff that her pain had improved with the use of ibuprofen and physical therapy (R. 159). Then, on July 23, 2004, Plaintiff stated her low back pain had worsened since she started physical therapy (R. 157). The ALJ noted Plaintiff's complaints on September 8, 2004, to Dr. Rezba of "marked pain in her lower right back in her gluteal muscle" were inconsistent with his finding that she had "no sciatic notch pain, and negative straight leg raising test results . . ." (R. 22). Plaintiff reported to Dr. Garner that she experienced "spontaneous onset of [back] pain in May of 2004 without any specific injury"; however, on September 8, 2004, Plaintiff informed Dr. Rezba that her back started hurting during her 2001 pregnancy, because "the baby was laying on the sciatic nerve for most of that time" (R. 22, 156). Plaintiff also testified at the Administrative

Hearing that the cause of her back pain was the position of her baby on her sciatic nerve during pregnancy (R. 42). Dr. Rezba wrote, in a November 2, 2005, letter, that Plaintiff had injured her back in May 2004 when she fell and that, during her pregnancy in 2001, "the fetus was laying on her left sciatic nerve" which caused, since the delivery of her baby, her legs to go "out on her" (R. 218). In addition to these inconsistencies considered by the ALJ, the record of evidence contains the statement of Plaintiff to Dr. Garner that she was unable to drive due to back pain (R. 208). Plaintiff noted on her Function Report - Adult that she did not drive, and she testified at the Administrative Hearing that she had never obtained a license to drive a vehicle (R. 40, 125). Also in the Function Report – Adult, Plaintiff wrote she could count change; at the Administrative hearing, Plaintiff testified she became "confused with the money changing (R. 42, 125)

Finally, the Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984) (citing *Tyler v. Weinberger*, 409 F.Supp. 776 (E.D.Va.1976)).

The undersigned finds substantial evidence supports the ALJ's decision that Plaintiff's subjective complaints were not entirely credible.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and

Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _10_ day of September, 2008.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE